**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**GAINESVILLE DIVISION**

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| AMERICAN HOME PRODUCTS LLC,[1] | ) |
| | ) Case No. 19-21054-JRS |
| Debtor. | ) |
| | ) Judge Sacca |
| | ) |

**DECLARATION OF WAYNE TANNER IN SUPPORT OF**
**CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Wayne Tanner, under penalty of perjury pursuant to 28 U.S.C. § 1746, hereby declare

as follows:

1.     I am a Senior Managing Director of Aurora Management Partners Inc.

("Aurora").  I also currently serve as the duly-appointed Chief Restructuring Officer of American

Home Products LLC, a Delaware limited liability company (the "Debtor").  In this capacity, I am

familiar with the Debtor's business, day-to-day operations, and financial affairs.

2.     Aurora was founded in Atlanta in 2000 by a group of Certified Turnaround

Professionals.  Since its founding, Aurora has completed over 250 successful engagements

focusing on complex business issues, turnarounds, chapter 11, and federal receiverships for both

private and public companies, with a focus on middle-market organizations.  I joined Aurora in

2015 with more than 35 years of consulting experience in a wide spectrum of executive

management engagements.   I have a bachelor's degree in business administration

(accounting/business law) and a Masters in Business Administration (corporate finance) from the

University of Georgia and I have completed post-graduate work at Harvard Business School.  I

am also a Certified Public Accountant and a Certified Fraud Examiner.  Prior to joining Aurora, I

---

[1] The last four digits of the Debtor's federal tax identification number are 3418.

was a worldwide equity audit and business advisory partner with Arthur Andersen for 22 years based in Atlanta.  During my last five years there, I managed the Southeastern Special Services Practice including corporate turnaround, bankruptcy and litigation support services.  I have consulted with companies ranging from family-owned operations to multi-national publicly owned entities in the banking, manufacturing and distribution, real estate, technology, construction and healthcare industries.

3.      Except as otherwise indicated, all statements set forth in this Declaration are based upon: (i) my personal knowledge as Chief Restructuring Officer of the Debtor; (ii) information supplied to me by other members of my engagement team or from the Debtor's employees, managers, agents or attorneys; (iii) my review of the Debtor's relevant documents or books and records; and/or (iv) my experience and knowledge of the Debtor's financial condition, business operations and financial affairs.  I have acted as Chief Restructuring Officer of the Debtor since approximately January 18, 2019.

4.      References to the Bankruptcy Code, the chapter 11 process, and related legal matters are based on my understanding of such matters in reliance on the explanation provided by, and the advice of, counsel.

5.      On the date hereof (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), with the United States Bankruptcy Court for the Northern District of Georgia (the "Court"), and filed various motions described herein requesting certain relief (collectively, the "First Day Pleadings").  I am authorized to submit this declaration (the "Declaration") on behalf of the Debtor and in support of the Debtor's chapter 11 case and the First Day Pleadings.

6.      The First Day Pleadings are intended to enable the Debtor to operate efficiently and effectively during the chapter 11 case, as well as to avoid certain adverse consequences that might otherwise result from the commencement of the chapter 11 case.  Among other things, the First Day Pleadings seek relief aimed at sustaining the going concern value of the Debtor.  I also believe that, absent immediate access to financing, use of cash collateral and the authority to make certain essential payments as sought under and described in greater detail in the First Day Pleadings, the Debtor would suffer immediate and irreparable harm to the detriment of its bankruptcy estate and creditors.

7.      If called to testify, I could and would testify to the facts set forth in this Declaration.  I am authorized by the Debtor to submit this Declaration.  I have reviewed the First Day Pleadings, and it is my belief that the relief sought therein is necessary to (i) avoid immediate and irreparable harm to the Debtor's business, and (ii) maximize and preserve the value of the Debtor's bankruptcy estate.  Unless otherwise indicated, the financial information contained herein is unaudited and subject to change.

## Background

8.      The Debtor filed its chapter 11 case as a means to maintain the going concern value of its business, preserve employment, avoid a piecemeal liquidation of its assets and conduct a process to maximize value for stakeholders.  This section of the Declaration provides an overview of the Debtor's business, a description of the Debtor's capital structure, an explanation of the reasons for the filing of the chapter 11 case, and a roadmap for how the Debtor plans to achieve its goals through this process.

A.      **Overview of the Debtor's Business**

9.      Headquartered in Gainesville, Georgia, the Debtor is a full-service blind, shutter and shade manufacturer and installer.  Founded over 40 years ago and now based primarily in the

southeast region of the United States, the Debtor differentiates itself through its unique customer experience and high attention to detail in the order, manufacture, and installation of custom window solutions. The Debtor's operations and related assets – also residing in Gainesville, Georgia – include customized production equipment and racking systems for production of high-quality home products.  As of the Petition Date, the Debtor employed approximately 113 people.

10.    The Debtor primarily produces custom plantation shutters (80% of the product mix) and sources from third parties for blinds and shades (20% of the product mix).  Consumers enjoy full in-house consultation, precise measurements, a full product offering and installation follow-ups to ensure product integrity and satisfaction.  As set forth below, although the manufacturing occurs in Georgia, the Debtor primarily utilizes an independent licensed dealer network to sell and install its products.

11.    The Debtor's current legal entity was created in 2015 as part of a transaction between the current equity holders and the owners and management team of American Made Shutters, which was the holding company of separate legal operating entities: Danmer Inc. and The Louver Shop.  At the time of the 2015 transaction, those combined entities formed one of the largest American custom shutter companies in the United States with a national footprint to supply shutters to the West, Southwest, Southeast, and Eastern states.

12.    As part of the 2015 transaction, the Debtor consolidated Danmer and The Louver Shop operating entities into one company, but kept the Danmer and the Louver Shop brands as separate operating divisions serving different parts of the country.  The Danmer division was based in Los Angeles, California, and included sales, service and installer employees at that location.  The Danmer division primarily served the West Coast, but was shut down in February 2019 due to economic factors.

13.    The Louver Shop division, based in Gainesville, Georgia, primarily uses a licensed dealer network to sell and install the Debtor's products.  As of the Petition Date, the Debtor maintains approximately 59 territories covering 23 states.  Each territory has an independent dealer that operates autonomously from the Debtor under a license agreement whereby it is required to purchase 100% of its products from the Debtor.  The dealer is responsible for converting leads to sales, installation and warranty work.  In turn, the Debtor is responsible for manufacturing shutters, procuring other non-manufactured products (e.g., blinds) and completing on-time and accurate deliveries to the dealer network.  The Debtor also provides marketing support in dealer territories and provides leads to its dealers.  As of the Petition Date, the Debtor utilizes approximately 42 dealers.

**B.    Financial Overview of the Debtor**

14.    After downsizing and ceasing certain of its unprofitable business lines in February 2019, the Debtor's annualized revenues are projected to be approximately $18 million (historically, prior to downsizing, the Debtor's annualized revenues were approximately $36 million).  As of the Petition Date, the Debtor had total liabilities of approximately $27 million.

**i.    Senior Facility**

15.    Pursuant to that certain Credit Agreement, dated as of January 27, 2015 (as amended, restated, supplemented or otherwise modified from time to time, the "Prepetition Senior Credit Agreement"), among the Debtor, the other credit parties party thereto, and The Huntington National Bank, a national banking association ("Original Senior Lender"), as Lender, and Original Senior Lender, as LC Issuer, the Original Senior Lender agreed to extend loans to, issue letters of credit for, and provide other credit accommodations to, the Debtor. The Prepetition Senior Credit Agreement, along with any other agreements and documents executed or delivered in connection therewith, including, without limitation, the "Loan Documents" as

defined therein, are collectively referred to herein as the "Prepetition Senior Loan Documents" (as the same may be amended, restated, supplemented or otherwise modified from time to time).

16.     All obligations of the Debtor arising under the Prepetition Senior Credit Agreement (including, without limitation, the "Obligations" as defined therein) and any other Prepetition Senior Loan Document shall collectively be referred to herein as the "Prepetition Senior Obligations." The Prepetition Senior Credit Agreement consisted of an initial term loan of $10,500,000 (the "Term Loan") and a revolving line of credit with initial availability of $3,000,000 (the "Revolver").   As of the Petition Date, the Debtor owed approximately $4,601,904.90 on the Term Loan and approximately $3,002,395.83 on the Revolver, for a total of $7,604,300.73.

17.     Pursuant to the Collateral Documents (as defined in the Prepetition Senior Credit Agreement) (as such documents are amended, restated, supplemented or otherwise modified from time to time, the "Prepetition Senior Collateral Documents"), by and between the Debtor and the Original Senior Lender, the Debtor granted to the Original Senior Lender, to secure the Prepetition Senior Obligations, a first priority security interest in and continuing lien (the "Prepetition Senior Liens") on substantially all of the Debtor's assets and property, and all proceeds, products, accessions, rents and profits thereof, in each case whether then owned or existing or thereafter acquired or arising. All collateral granted or pledged by the Debtor pursuant to any Prepetition Senior Collateral Document or any other Prepetition Senior Loan Document, including, without limitation, the "Collateral" as defined in the Prepetition Senior Credit Agreement, and all pre-petition and post-petition proceeds thereof shall collectively be referred to herein as the "Prepetition Senior Collateral".

ii.    **Junior Facility**

18.    Pursuant to that certain Senior Subordinated Note Purchase Agreement, dated as of January 27, 2015 (as amended, restated, supplemented or otherwise modified from time to time, the "Prepetition Junior Credit Agreement", and together with the Prepetition Senior Credit Agreement, the "Prepetition Credit Agreements"), among the Debtor, the other credit parties party thereto, and The Huntington Capital Investment Company II, an Ohio corporation ("Original Junior Lender", and together with the Original Senior Lender, collectively the "Original Lenders"), as Lender, the Original Junior Lender agreed to extend a loan and provide other credit accommodations to the Debtor. The Prepetition Junior Credit Agreement, along with any other agreements and documents executed or delivered in connection therewith, including, without limitation, the "Loan Documents" as defined therein, are collectively referred to herein as the "Prepetition Junior Loan Documents" (as the same may be amended, restated, supplemented or otherwise modified from time to time) and together with the Prepetition Senior Loan Documents, collectively, the "Prepetition Loan Documents".

19.    All obligations of the Debtor arising under the Prepetition Junior Credit Agreement (including, without limitation, the "Obligations" as defined therein) and any other Prepetition Junior Loan Document shall collectively be referred to herein as the "Prepetition Junior Obligations".  The Prepetition Junior Obligations, together with the Prepetition Senior Obligations, shall be referred to herein collectively as the "Prepetition Obligations". The Prepetition Junior Credit Agreement consisted of an initial loan of $4,000,000.  As of the Petition Date the balance owing by the Debtor is approximately $5,117,088.73 on the Prepetition Junior Obligations.

20.    Pursuant to the Collateral Documents (as defined in the Prepetition Junior Credit Agreement) (as such documents are amended, restated, supplemented or otherwise modified

from time to time, the "Prepetition Junior Collateral Documents", and together with the Prepetition Senior Collateral Documents, collectively, the "Prepetition Collateral Documents"), by and between the Debtor and the Original Junior Lender, the Debtor granted to the Original Junior Lender, to secure the Prepetition Junior Obligations, a second priority security interest in and continuing lien (the "Prepetition Junior Liens", and together with the Prepetition Senior Liens, the "Prepetition Liens") on substantially all of the Debtor's assets and property, and all proceeds, products, accessions, rents and profits thereof, in each case whether then owned or existing or thereafter acquired or arising. All collateral granted or pledged by the Debtor pursuant to any Prepetition Junior Collateral Document or any other Prepetition Junior Loan Document, including, without limitation, the "Collateral" as defined in the Prepetition Junior Credit Agreement, and all pre-petition and post-petition proceeds thereof shall collectively be referred to herein as the "Prepetition Junior Collateral" and together with the Prepetition Senior Collateral, the "Prepetition Collateral".

### iii.    **Intercreditor Agreement**

21.    The relative priorities of the Prepetition Senior Obligations and Prepetition Junior Obligations, and Prepetition Senior Liens and Prepetition Junior Liens, are governed by that certain Subordination and Intercreditor Agreement dated January 27, 2015, by and among Original Senior Lender, Original Junior Lender and the Debtor, pursuant to which, among other things, the parties thereto agreed that the Prepetition Senior Obligations are senior to the Prepetition Junior Obligations, and the Prepetition Senior Liens are senior the Prepetition Junior Liens.  The Intercreditor Agreement also contains other standard provisions governing the relationship between Original Senior Lender and the Original Junior Lender.

### iv.    **Purchase of Indebtedness**

22.    The Louver Shop Holdings, LLC (in such capacity, "Prepetition Secured Lender") is now the holder of the Prepetition Loan Documents via assignment from Original Senior Lender and Original Junior Lender, made in accordance with (i) that certain Loan Sale Agreement dated May 24, 2019, by and between Original Senior Lender and Prepetition Secured Lender; and (ii) that certain Loan Sale Agreement dated May 24, 2019, by and between Original Junior Lender and Prepetition Secured Lender.

### v.    **Unsecured Debt**

23.    As of the Petition Date, the Debtor also had unsecured obligations in excess of $14.8 million, including more than $4.8 million in trade debt, $10 million in unsecured note debt, and other unliquidated claims.

### C.    **Events Leading to Bankruptcy**

24.    The Debtor has faced a number of significant challenges over the past few years, ultimately leading to the filing of this chapter 11 case.    The Debtor began to experience production and quality issues driven in part by poor implementation after consolidating all production to the Gainesville facility.    Done primarily as a cost-saving measure that would reduce overhead and create efficiencies, the shift to a single manufacturing facility located in the southeastern part of the country led to labor turnover, extended lead times, missed delivery dates, and an increase in the number of damaged or non-compliant goods due to having to ship product all the way across the country.    These challenges, coupled with the high secured debt load, have continued to plague the Debtor for the last couple of years.

25.    These issues finally caught up with the Debtor as the Danmer division began to lose money.    In late 2018, the Debtor tripped certain covenants in its Prepetition Senior Credit Agreement and was in default with the Original Senior Lender.    Also in 2018, the Debtor had

significant turnover in its officer ranks having employed three CEOs that year.  In January 2019, the Original Senior Lender sent the Debtor a notice of default and reservation of rights, but did not exercise any remedies at that time.

26.     The Debtor was also a party to certain contracts with The Home Depot to sell product through its store channels.  Unfortunately, the margins on these contracts did not prove to be profitable and the Debtor attempted to negotiate a revised deal with The Home Depot, but was ultimately unsuccessful.

27.     On or about January 18, 2019, the Debtor hired me to serve as Chief Restructuring Officer to help design and implement a plan to realize value for the Debtor's business and its assets. Since that time, I, with the assistance of restructuring counsel, Aurora and the management team, have worked with the Debtor to take significant steps to "right-size" the business by working with the Debtor's key constituencies and discontinuing the operations of certain unprofitable business lines that were the largest contributors to the financial distress of the business.

28.     As a result, the Debtor made the decision in late January 2019, to shut down the Danmer operations on the West Coast and discontinue to relationship with The Home Depot. The Debtor also made the decision to focus primarily on The Louver Shop division, its product lines and its independent dealer network.  The Debtor continued to work with its vendors and licensed dealers to maintain product flow and drive down lead times.

29.     After right-sizing the business and shutting down the unprofitable business lines, the Debtor made the decision to seek a buyer or financial partner to help sustain the going concern value of the business.  Aurora, with the assistance of the Debtor's management and its

other professional advisors, commenced marketing efforts to locate a potential purchaser for the Debtor.

30.      As part of this prepetition marketing process, Aurora assisted the Debtor in: (a) preparing and negotiating confidentiality agreements for prospective purchasers; (b) preparing detailed information about the Debtor's business, operations and financial condition; (c) identifying and contacting potential purchasers; (d) establishing a data room for due diligence to be conducted by prospective purchasers; (e) drafting a "teaser" describing the transaction; (f) evaluating proposals from prospective purchasers; and (g) negotiating a stalking horse offer.

31.      During the prepetition marketing period, Aurora and the Debtor contacted over 25 potential investors/buyers.  Of those contacted, 16 parties executed confidentiality agreements and were given operational, organizational and financial information on the Debtor.  Of those parties executing confidentiality agreements, five made visits to the Debtor's facilities.   The Debtor received two transaction offers from parties interested in pursuing a deal with the Debtor.

32.      In April 2019, the Debtor received an offer to purchase the Acquired Assets from The Louver Shop Holdings, LLC (the "Stalking Horse Bidder").  The offer contemplated that the Stalking Horse Bidder would acquire the Prepetition Loans from Original Lenders and credit bid those loans to acquire the Debtor's assets through a chapter 11 sale process, subject to higher and better bids, as well as provide postpetition financing to supplement the Debtor's cash flow in supporting the costs of operations and administration of the bankruptcy case.  No other offer received would have provided more value to the Debtor or its creditors than that of the Stalking Horse Bidder.  The Debtor and the Stalking Horse Bidder executed that certain Asset Purchase Agreement, dated May 29, 2019, which is subject to higher and better offers and Court approval.

**Plan for the Chapter 11 Case**

33.     The Debtor intends to use the chapter 11 process to consummate a going concern sale of the business to the Stalking Horse Bidder or to any interested and qualified party making a higher and better offer. The general terms of the Stalking Horse Bidder's offer are as follows:

- The Stalking Horse Bidder will acquire substantially all assets of the Debtor for $8,000,000, which will consist of a credit bid of a portion of the prepetition secured indebtedness of the Debtor to the Stalking Horse Bidder, with a right to credit bid any additional amounts of the prepetition indebtedness and any outstanding portion of the debtor in possession financing to be provided by the Stalking Horse Bidder;

- The offer will be subject to higher and better bids pursuant to an approximately 60-day sale process;

- The offer includes the hiring of substantially all current employees at their prevailing wage rates.

34.     This proposed transaction, subject to higher and better offers, is in the best interest of the Debtor, its creditors, its dealers, and the many other parties in interest. Absent the ability to consummate a sale pursuant to section 363 of the Bankruptcy Code, the Debtor would likely have to cease operations and begin a piecemeal liquidation of its assets.

**Facts in Support of the First Day Pleadings**

35.     Concurrently with the filing of the chapter 11 case, the Debtor has filed a number of First Day Pleadings,[2] each of which is described briefly below.  I have reviewed each of the First Day Pleadings (including the exhibits thereto), and I believe that the relief sought in each of the First Day Pleadings: (i) is necessary to enable the Debtor to operate in chapter 11 with a minimum of disruption; and (ii) constitutes a critical element in maintaining the value of the Debtor's assets during the chapter 11 process.  The Debtor anticipates that the Court will conduct

---

[2] Capitalized terms used in the descriptions of the First Day Pleadings and not otherwise defined herein have the meanings given to them in the applicable First Day Pleadings.  The descriptions of the First Day Pleadings contained herein are only intended to be summaries.

a hearing soon after the commencement of the chapter 11 case (the "First Day Hearing") at which the Court will hear and consider the First Day Pleadings.

36.     Generally, the First Day Pleadings have been designed to meet the primary goal of continuing the Debtor's operations postpetition in a manner that will minimize any potential impact on the Debtor's business.  As such, the First Day Pleadings seek to: (i) obtain the use of postpetition financing; (ii) protect the Debtor's employees and other parties in interest; (iii) maintain the Debtor's operations and business throughout the chapter 11 case; and (iv) efficiently administer the bankruptcy case.

A.     **Motion of Debtor for Interim and Final Orders: (I) Authorizing Debtor to Obtain Secured Post-Petition Financing; (ii) Authorizing the Use of Cash Collateral; (iii) Granting Adequate Protection; (iv) Modifying the Automatic Stay; (v) Setting a Final Hearing; and (vi) Granting Related Relief (the "DIP Financing Motion")**

37.     In the DIP Financing Motion, the Debtor is seeking approval, on an interim and final basis, of that certain Debtor-in-Possession Credit Agreement, dated May 29, 2019, by and between the Debtor, as borrower, and The Louver Shop Holding LLC, as lender (in its capacity as post-petition lender, the "Postpetition Lender"), under which the Postpetition Lender has agreed to provide the Debtor with a $400,000 multi-draw term loan facility (the "Postpetition Loan"), pursuant to a debtor in possession financing facility, a copy of which is attached to the DIP Financing Motion (the "Postpetition Credit Agreement").  As more fully described in the motion to establish bidding procedures and to sell assets filed contemporaneously with the Debtor's other first day papers, the Postpetition Lender (in its capacity as the Stalking Horse Bidder) has also entered into an APA to purchase substantially all of the assets of the Debtor, subject to higher and better offers and Court approval.  Before the sale may close, however, the proposed financing offered by the Postpetition Lender will give the Debtor sufficient financing and flexibility to operate in chapter 11 and run a court-supervised chapter 11 sale process.

38.    Prior to the Petition Date, the Debtor, with the assistance of its professionals, searched for potential sources of debtor in possession financing.  The Debtor had interactions with the Original Senior Lender and Original Junior Lender, as well as other potential lenders and certain of the Debtor's equity holders, about the prospect of the provision of debtor in possession financing.  Given the more than $12.5 million of secured debt and the position of the Original Lenders that they would not allow themselves to be primed, the Debtor and its professionals determined that it would be futile to seek other financing from third-party traditional lenders.  Other than the Postpetition Lender, no other party was willing to provide debtor in possession financing independent of doing so as part of a comprehensive sale transaction.

39.    Upon entry of the Interim Order (which is attached as an exhibit to the DIP Financing Motion), the Debtor anticipates that it will immediately begin making draws on the Postpetition Loan subject to the terms of the Budget.  The Debtor is seeking an initial draw of $200,000.  This money will be used to fund operations.  The continued viability of the Debtor's business and the success of its restructuring efforts hinges upon the Debtor's ability to immediately access financing. Absent an immediate infusion of capital or access to financing, the Debtor will be irreparably harmed because it simply would not be able to operate its business for the duration of the chapter 11 case to get to a sale closing.  Accordingly, at this time, the Debtor's liquidity needs can be satisfied only if the Debtor is authorized to borrow under the proposed Postpetition Credit Agreement, use such proceeds to fund operations, and use as otherwise provided in the Postpetition Credit Agreement and proposed Interim Order.

**B.**     **Motion of Debtor for an Order Granting Additional Time to File Schedules and Statements (the "Extension Motion")**

40.     I understand that the Bankruptcy Code and Bankruptcy Rules require the Debtor to file with the Court within 14 days of the Petition Date: (i) its schedules of assets and liabilities; (ii) its statements of financial affairs; (iii) its schedules of current income and expenditures; (iv) its lists of executory contracts and unexpired leases; and (v) its lists of equity security holders (collectively, the "Schedules and Statements").

41.     By the Extension Motion, the Debtor is seeking entry of an order extending the time for filing the Schedules and Statements for an additional 14 days (for a total of 28 days from the Petition Date), through and including June 26, 2019.

42.     The Debtor is filing the Extension Motion because it has numerous creditors and other interested parties, and the Debtor requires additional time to accurately review and report all of the required information.  Given the current state of its business and the large number of parties in interest, the Debtor has not had ample opportunity to gather all of the necessary information to prepare and file its Schedules and Statements.

43.     The Debtor have commenced the task of gathering the necessary information to prepare and finalize the Schedules and Statements, but Debtor believe that the 14-day automatic extension of time to file such Schedules and Statements provided by Bankruptcy Rule 1007(c) is not sufficient to permit completion of the Schedules and Statements.

**C.**     **Motion of Debtor for an Order (i) Authorizing the Debtor to (a) Pay Certain Prepetition Employee Obligations and Related Claims and (b) Continue to Provide Employee Benefits in the Ordinary Course of Business and (ii) Granting Related Relief (the "Employee Motion")**

44.     The Debtor believes it has valuable assets in its employees and that any delay in paying prepetition compensation or benefits to its employees would significantly jeopardize the Debtor's relationships with employees and irreparably harm morale at a time when the need for

the continued service of the Debtor's employees is most critical.  As of the Petition Date, the Debtor employs approximately 113 employees.  The employees include the Debtor's valuable operators, laborers, managers, warehouse and shipping staffers, drivers, salespeople, and administrative and corporate management employees.  The employees are the backbone of the Debtor's company and the Debtor's restructuring efforts, and the Debtor requires the full and uninterrupted service of the employees throughout its chapter 11 case to adequately provide services to the Debtor's customers and dealer network.  The employees have an intimate knowledge of the Debtor's business and operations, and any deterioration in morale, welfare and focus at this critical time undoubtedly would adversely affect the Debtor, the value of its assets and business, and ultimately, the Debtor's ability to achieve a successful outcome in the chapter 11 case.

45.    The Debtor has costs and obligations associated with its employees that arose prior to the Petition Date.  Certain of those obligations are outstanding and due and payable as of the Petition Date, and certain will become due and payable in the ordinary course of business after the Petition Date.  These obligations include, but are not limited to, wages, reimbursable expenses, a small monthly bonus program for line workers, and benefit obligations and claims. The Debtor seeks the Court's approval to continue each of these programs in the ordinary course of business so as to maintain employee morale and dedication throughout the Debtor's chapter 11 case.

46.    The Employee Motion does not seek to alter the Debtor's employees' compensation, paid time off, or other benefit policies at this time.  The Employee Motion is intended only (i) to permit the Debtor, in its sole discretion, to make payments consistent with the Debtor's existing polices to the extent that, without the benefit of an order approving the

Motion, such payments may be inconsistent with the relevant provisions of the Bankruptcy Code, and (ii) to permit the Debtor, in its discretion, to continue to honor its practices, programs and policies with respect to its employees, as such practices, programs and policies were in effect as of the Petition Date.  Continued payment of all of the obligations detailed in the Employee Motion in accordance with the Debtor's prepetition business practices is in the best interest of the Debtor's estate, its creditors, and all parties in interest, and will enable the Debtor to continue to operate its business in an economic and efficient manner without disruption.

**D.**     **Motion of Debtor for an Order (i) Authorizing Continued Use of Existing Cash Management System; (ii) Authorizing Maintenance of Existing Bank Accounts; (iii) Authorizing Changes to Treasury Management Services; and (iv) Waiving Certain Investment and Deposit Requirements (the "Cash Management Motion")**

47.     By the Cash Management Motion, the Debtor is seeking entry of an order (i) authorizing the continued use of its existing cash management system (the "Cash Management System"), (ii) authorizing the maintenance of existing bank accounts (the "Bank Accounts"), (iii) authorizing changes in treasury management services; and (iv) waiving certain investment and deposit requirements.

48.     I have been informed that the Operating Guidelines and Reporting Requirements for Debtors in Possession and Chapter 11 Trustees promulgated by the Office of the United States Trustee for the Northern District of Georgia require that a debtor, among other things: (i) close all bank accounts and open new debtor in possession bank accounts; (ii) establish a separate debtor in possession account for all estate monies required for the payment of taxes, including payroll taxes; (iii) maintain separate debtor in possession accounts for cash collateral; and (iv) obtain checks for all debtor in possession accounts which bear the designation "Debtor-In-Possession," the bankruptcy case number, and the type of account.  The relief requested in the

Cash Management Motion is designed to maintain the status quo and avoid any significant disruptions to its operations.

49.    The Cash Management Motion describes the Debtor's cash management system in detail.  The Debtor's cash management system includes four separate bank accounts, which are maintained at The Huntington National Bank and United Community Bank (collectively, the "Bank Accounts"). Many of the Bank Accounts are primarily utilized by the Debtor to manage payments from customers, and to make disbursements, including vendor payments, payroll, and employee benefits.

50.    The Debtor's cash management system is similar to those commonly employed by companies of comparable size and complexity and allows the Debtor to control and monitor corporate funds, ensure cash availability, and reduce administrative expenses by facilitating the movement of funds and the development of timely and accurate account balances and presentment information.

51.    Given the Debtor's corporate and financial structure, it would be burdensome for the Debtor to establish an entirely new cash management system. Any disruption of the Debtor's accounting and cash management procedures would be cumbersome and costly to the Debtor's operations, and any delay could have an adverse impact on the Debtor's ability to further its restructuring efforts, make payments to its employees, and pay other necessary expenses during the chapter 11 process.   Thus, under the circumstances, maintaining the Debtor's cash management system is in the best interest of the Debtor's estate, customers, and creditors.

52.    The Cash Management Motion also requests this Court's authority for the Debtor to continue using its existing Bank Accounts on a postpetition basis.  Allowing the Debtor to

continue to use its prepetition Bank Accounts will assist the Debtor in making a smooth transition to operating in chapter 11 and ensure that the Debtor's cash flow is not interrupted.

53.    While it would be difficult and harmful to the Debtor to be forced to change its cash management system and open new accounts immediately, the Debtor does intend to make certain changes during the course of its chapter 11 case.  Huntington used to be the Debtor's primary secured creditor in addition to being its main deposit bank and source of treasury management services.  However, prior to the Petition Date, Huntington sold its debt positions to the Prepetition Lender.  Because Huntington is no longer the Debtor's lender, it desires to end its deposit and treasury management relationship with the Debtor, a desire that the Debtor understands.  To allow for an appropriate transition, Huntington has allowed the Debtor approximately one month to transition these services.  Accordingly, the Debtor expects to replace the current cash management system with a new primary bank within that time.  The Debtor requests authority to do so in the Cash Management Motion out of an abundance of caution.

54.    Finally, the Cash Management Motion requests that this Court waive any applicable investment and deposit guidelines solely with regard to the Bank Accounts during the Debtor's bankruptcy case.  The Debtor's Bank Accounts are not kept at high-risk institutions or in volatile investments.  Rather, the Debtor holds standard accounts at highly regarded, substantial, FDIC-insured and bonded financial institutions; therefore, any applicable deposit restrictions can be waived.

**E.    Motion of Debtor for an Order (i) Authorizing the Debtor to Pay Prepetition (a) Trust Fund Taxes and (b) Licensing Fees; and (ii) Authorizing and Directing Financial Institutions to Honor and Process Checks and Transfers Related to Such Relief (the "Taxes Motion")**

55.    The Debtor pays taxes to various authorities in the ordinary course of its business, including employee-related taxes, sales taxes, and business licensing fees. As of the Petition Date, the Debtor have collected certain taxes that accrued during a prepetition period, but are not yet due to the relevant taxing authorities.  The Debtor has also collected certain "trust fund" taxes for the benefit of the taxing authorities, which do not properly constitute property of the Debtor's estate.  The Debtor seeks authority to pay all such trust fund taxes in the ordinary course of business.

56.    The Debtor also pays certain fees related to permits and licenses necessary to operate its business.  The Debtor's remittance of these fees varies greatly based on the various licensing authorities' requirements.  The Debtor always remains current with its required payment of licensing fees, and it has paid any licensing fees that became due prior to the Petition Date.  In an abundance of caution, however, the Debtor requests authority to continue to pay any licensing fees that come due in the ordinary course of business throughout this chapter 11 case, regardless of whether the licensing fees relate in part to a prepetition period.

57.    The Debtor wishes to remain current on and continue to pay the trust fund taxes in a timely manner in order to prevent potential issues during the chapter 11 case and avoid liability for non-payment. The Debtor's failure to pay these taxes would have a detrimental impact on its ability to operate its business in the ordinary course. Furthermore, if the Debtor failed to pay these taxes, certain taxing authorities may become involved in the Debtor's bankruptcy case, possibly creating undue delay and complications to the Debtor's restructuring efforts.

58.    The Debtor's trust fund taxes do not constitute property of the Debtor's estate, and such amounts are not available to the Debtor's creditors.  Therefore, immediate payment of the relevant taxes will not adversely affect the Debtor's estate or its creditors.  Uninterrupted operations are necessary for the Debtor to maintain its reputation, avoid significant variations in its cash flow, and preserve the value of the business for a sale process.  The Debtor believes that the estate will not be materially harmed if the Court permits the Debtor to pay the relevant trust fund taxes.

**F.    Motion of Debtor for Interim and Final Orders (i) Prohibiting Utilities from Altering, Refusing, or Discontinuing Services; (ii) Determining That Utilities are Adequately Assured of Payment; and (iii) Establishing Procedures for Determining Requests for Additional Assurance (the "Utilities Motion")**

59.    In connection with the operation of its business, the Debtor obtains various utility services, such as gas, electric, water, telephone, cable/internet, waste, and other services (collectively, the "Utility Services") from certain utility companies (collectively, the "Utility Companies") for the Debtor's company location in Gainesville, Georgia. Uninterrupted Utility Services are critical to the Debtor's ability to sustain its operations during the pendency of the chapter 11 case.  Any interruption in the Utility Services, however slight, would jeopardize the restructuring efforts of the Debtor, the Debtor's ability to operate its facility, and the safety of the Debtor's employees.

60.    By the Utilities Motion, the Debtor seeks interim and final orders:  (i) prohibiting the Utility Companies from altering, refusing, or discontinuing Utility Services (as defined below) to, or discriminating against, the Debtor on account of amounts outstanding prior to the Petition Date or any perceived inadequacy of the Debtor's proposed adequate assurance; (ii) determining that the Utility Companies, including, but not limited to, those listed in the Utilities Motion, have been provided with adequate assurance of payment within the meaning of

section 366 of the Bankruptcy Code through the provision of a one month deposit per requests from utility companies; and (iii) approving the Debtor's proposed procedures for determining requests for additional adequate assurance of payment to Utility Companies for future utility services.

## **Conclusion**

61.    For all of the reasons stated herein, I believe that the approval of the First Day Pleadings is in the best interest of the Debtor, its estate, its creditors, and all parties in interest.

*[Remainder of page intentionally left blank; signature page to follow]*

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


May __, 2019                          _____
                                     Wayne Tanner
                                     Chief Restructuring Officer
                                     American Home Products LLC