## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF GEORGIA
## GAINESVILLE DIVISION

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| AMERICAN HOME PRODUCTS LLC,[1] | ) |
| | ) Case No. 19-21054-JRS |
| Debtor. | ) |
| | ) Judge Sacca |
| | ) |

### MOTION OF DEBTOR FOR INTERIM AND FINAL ORDERS: (I) AUTHORIZING DEBTOR TO OBTAIN SECURED POST-PETITION FINANCING; (II) AUTHORIZING THE USE OF CASH COLLATERAL; (III) GRANTING ADEQUATE PROTECTION; (IV) MODIFYING THE AUTOMATIC STAY; (V) SETTING FINAL HEARING; AND (VI) GRANTING RELATED RELIEF

The above-captioned debtor and debtor in possession (the "Debtor") hereby moves the Court (the "Motion") for the entry of interim and final orders, pursuant to sections 105, 361, 362, 363(c), 364(c), 364(d), 503, 506(c) and 507(b) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"): (i) authorizing the Debtor to obtain debtor-in-possession financing from the Postpetition Lender (as defined herein) pursuant to the terms and conditions of (a) the Interim Order and any Final Order (each as defined herein) and (b) the Postpetition Credit Agreement (as defined herein); (ii) authorizing and approving the Debtor's use of Cash Collateral (as defined herein) of the Prepetition Secured Lender (as defined herein); (iii) granting adequate protection; (iv) modifying the automatic stay; (v) setting a final hearing; and (vi) granting any further and related relief as the Court deems just and equitable.

In support of this Motion, the Debtor respectfully represents as follows:

### Background

1.      On the date hereof (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtor is continuing in possession of its

---

[1] The last four digits of the Debtor's federal tax identification number are 3418.

property and is operating and managing its business, as debtor in possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code.

2.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157.  Consideration of this Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The venue of Debtor's chapter 11 case and this Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.    The factual background regarding the Debtor, including its business operations, its capital and debt structure, and the events leading to the filing of the chapter 11 case, is set forth in detail in the Declaration of Wayne Tanner in Support of Chapter 11 Petition and First Day Motions (the "Tanner Declaration"), filed contemporaneously with this Motion and fully incorporated herein by reference.[2]

A.    **The Debtor's Prepetition Capital Structure**

a.    **Senior Facility**

4.    Pursuant to that certain Credit Agreement, dated as of January 27, 2015 (as amended, restated, supplemented or otherwise modified from time to time, the "Prepetition Senior Credit Agreement"), among the Debtor, the other credit parties party thereto, and The Huntington National Bank, a national banking association ("Original Senior Lender"), as Lender, and Original Senior Lender, as LC Issuer, the Original Senior Lender agreed to extend loans to, issue letters of credit for, and provide other credit accommodations to, the Debtor. The Prepetition Senior Credit Agreement, along with any other agreements and documents executed or delivered in connection therewith, including, without limitation, the "Loan Documents" as

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Tanner Declaration.

defined therein, are collectively referred to herein as the "Prepetition Senior Loan Documents" (as the same may be amended, restated, supplemented or otherwise modified from time to time).

5.     All obligations of the Debtor arising under the Prepetition Senior Credit Agreement (including, without limitation, the "Obligations" as defined therein) and any other Prepetition Senior Loan Document shall collectively be referred to herein as the "Prepetition Senior Obligations." The Prepetition Senior Credit Agreement consisted of an initial term loan of $10,500,000 (the "Term Loan"), a revolving line of credit with initial availability of $3,000,000 (the "Revolver").  As of the Petition Date, the Debtor owed approximately $4,601,904.90 on the Term Loan and approximately $3,002,395.83  on the Revolver, for a total of $7,604,300.73.

6.     Pursuant to the Collateral Documents (as defined in the Prepetition Senior Credit Agreement) (as such documents are amended, restated, supplemented or otherwise modified from time to time, the "Prepetition Senior Collateral Documents"), by and between the Debtor and the Original Senior Lender, the Debtor granted to the Original Senior Lender, to secure the Prepetition Senior Obligations, a first priority security interest in and continuing lien (the "Prepetition Senior Liens") on substantially all of the Debtor's assets and property, and all proceeds, products, accessions, rents and profits thereof, in each case whether then owned or existing or thereafter acquired or arising. All collateral granted or pledged by the Debtor pursuant to any Prepetition Senior Collateral Document or any other Prepetition Senior Loan Document, including, without limitation, the "Collateral" as defined in the Prepetition Senior Credit Agreement, and all pre-petition and post-petition proceeds thereof shall collectively be referred to herein as the "Prepetition Senior Collateral".

7.     The Prepetition First Lien Obligations owed to the Prepetition First Lien Lender (defined below) are secured by liens (the "Prepetition First Priority Liens") on substantially all of

the existing and after-acquired assets of the Borrower and the proceeds thereof, and such liens are perfected and have priority over all other liens (the "Prepetition Senior Secured Collateral").

**b.    Junior Facility**

8.     Pursuant to that certain Senior Subordinated Note Purchase Agreement, dated as of January 27, 2015 (as amended, restated, supplemented or otherwise modified from time to time, the "Prepetition Junior Credit Agreement", and together with the Prepetition Senior Credit Agreement, the "Prepetition Credit Agreements"), among the Debtor, the other credit parties party thereto, and The Huntington Capital Investment Company II, an Ohio corporation ("Original Junior Lender", and together with the Original Senior Lender, collectively the "Original Lenders"), as Lender, the Original Junior Lender agreed to extend a loan and provide other credit accommodations to the Debtor. The Prepetition Junior Credit Agreement, along with any other agreements and documents executed or delivered in connection therewith, including, without limitation, the "Loan Documents" as defined therein, are collectively referred to herein as the "Prepetition Junior Loan Documents" (as the same may be amended, restated, supplemented or otherwise modified from time to time) and together with the Prepetition Senior Loan Documents, collectively, the "Prepetition Loan Documents".

9.     All obligations of the Debtor arising under the Prepetition Junior Credit Agreement (including, without limitation, the "Obligations" as defined therein) and any other Prepetition Junior Loan Document shall collectively be referred to herein as the "Prepetition Junior Obligations".  The Prepetition Junior Obligations, together with the Prepetition Senior Obligations, shall be referred to herein collectively as the "Prepetition Obligations". The Prepetition Junior Credit Agreement consisted of an initial loan of $4,000,000.  As of the Petition Date, the balance owing by the Debtor is approximately $5,117,088.73 on the Prepetition Junior Obligations.

{8110552:7 }

10.     Pursuant to the Collateral Documents (as defined in the Prepetition Junior Credit Agreement) (as such documents are amended, restated, supplemented or otherwise modified from time to time, the "Prepetition Junior Collateral Documents", and together with the Prepetition Senior Collateral Documents, collectively, the "Prepetition Collateral Documents"), by and between the Debtor and the Original Junior Lender, the Debtor granted to the Original Junior Lender, to secure the Prepetition Junior Obligations, a second priority security interest in and continuing lien (the "Prepetition Junior Liens", and together with the Prepetition Senior Liens, the "Prepetition Liens") on substantially all of the Debtor's assets and property, and all proceeds, products, accessions, rents and profits thereof, in each case whether then owned or existing or thereafter acquired or arising. All collateral granted or pledged by the Debtor pursuant to any Prepetition Junior Collateral Document or any other Prepetition Junior Loan Document, including, without limitation, the "Collateral" as defined in the Prepetition Junior Credit Agreement, and all pre-petition and post-petition proceeds thereof shall collectively be referred to herein as the "Prepetition Junior Collateral" and together with the Prepetition Senior Collateral, the "Prepetition Collateral".

### c.     Intercreditor Agreement

11.     The relative priorities of the Prepetition Senior Obligations and Prepetition Junior Obligations, and Prepetition Senior Liens and Prepetition Junior Liens, are governed by that certain Subordination and Intercreditor Agreement dated January 27, 2015, by and among Original Senior Lender, Original Junior Lender and the Debtor, pursuant to which, among other things, the parties thereto agreed that the Prepetition Senior Obligations are senior to the Prepetition Junior Obligations, and the Prepetition Senior Liens are senior the Prepetition Junior Liens.   The Intercreditor Agreement also contains other standard provisions governing the relationship between Original Senior Lender and the Original Junior Lender.

    **d.**    **Purchase of Indebtedness**

12.    The Louver Shop Holdings, LLC (in such capacity, "Prepetition Secured Lender") is the holder of the Prepetition Loan Documents via assignment from Original Senior Lender and Original Junior Lender, made in accordance with (i) that certain Loan Sale Agreement dated May 24, 2019, by and between Original Senior Lender and Prepetition Secured Lender; and (ii) that certain Loan Sale Agreement dated May 24, 2019, by and between Original Junior Lender and Prepetition Secured Lender.

**B.**    **Preliminary Statement**

13.    By this Motion, the Debtor seeks approval, on an interim and final basis, of a $400,000 multi-draw term loan facility (the "Postpetition Facility") pursuant to that certain Debtor-In-Possession Credit Agreement, dated as of May 29, 2019, by and among Debtor and The Louver Shop Holdings, LLC (in such capacity, "Postpetition Lender"), in substantially the form attached hereto as Exhibit A (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "Postpetition Credit Agreement")[3], the DIP Loan Note, dated as of May 29, 2019, executed and delivered by the Debtor in favor of Postpetition Lender, in substantially the form attached to the Motion as Exhibit B (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "Postpetition Note"), and the Security Agreement, dated as of May 29, 2019, by and among the Debtor and Postpetition Lender, in substantially the form attached to the Motion as Exhibit C (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "Postpetition Security Agreement", and together with the Postpetition Credit Agreement and Postpetition Note, collectively, the "Postpetition Loan Documents").

---

[3] Capitalized terms used but not defined herein shall have the meaning assigned to such terms in the Postpetition Credit Agreement.

14.     As stated in the Tanner Declaration, the Debtor's goal in its chapter 11 case is to sell substantially all of its assets. As more fully described in the motion to establish bidding procedures and the motion to sell assets, the Debtor and The Louver Shop Holdings, LLC, as stalking horse bidder, and, subject to higher and better offers, has also entered into that certain Asset Purchase Agreement dated May 29, 2019 (the "APA"), to purchase substantially all of the assets of the Debtor.  Before the sale may close, however, the proposed financing offered by the Postpetition Lender will give the Debtor sufficient financing and flexibility to operate in chapter 11 and run a court-supervised chapter 11 sale process.

15.     Prior to the Petition Date, the Debtor, with the assistance of its professionals, searched for potential sources of debtor in possession financing.  The Debtor had interactions with the Original Senior Lender and Original Junior Lender, as well as other potential lenders and certain of the Debtor's equity holders, about the prospect of the provision of debtor in possession financing.  Given the more than $12.5 million of secured debt and the position of the Original Lenders that they would not allow themselves to be primed, the Debtor and its professionals determined that it would be futile to seek other financing from third-party traditional lenders.  Other than the Postpetition Lender, no other party was willing to provide debtor in possession financing independent of doing so as part of a comprehensive sale transaction.

16.     As described in more detail in the Tanner Declaration, after a prepetition marketing process, the Debtor received an offer from the Postpetition Lender that included the Postpetition Lender purchasing the Original Lenders' prepetition secured debt, the issuance of a multi-draw term loan debtor in possession credit facility, and a stalking horse bid for a potential purchase of substantially all of the Debtor's assets.  The Debtor then focused its efforts on

{8110552:7 }

negotiating bankruptcy financing and the APA with the Postpetition Lender.  The Postpetition Credit Agreement and the Postpetition Loan Documents are the result of such negotiation over several weeks and thus constitute fair and market-based financing.  As described in more detail below, the rates, fees, and other expenses to be paid in connection with the Postpetition Credit Agreement are reasonable and are generally in line with comparable fees for other post-petition financing facilities of this size and nature.

17.    The consideration provided by the Postpetition Lender goes well beyond the funds being supplied pursuant to the Postpetition Facility.  As stated above, the loans provided thereunder are part of an integrated transaction pursuant to which the Postpetition Lender has also offered to acquire substantially all assets of the Debtor and operate the business as a going concern, including the retention of substantially all employees.  As part of this transaction, the Postpetition Lender has also entered into contingent agreements with the Debtor's landlord so that it knows it will have a long term lease for the Debtor's facility upon closing of the transaction.  As a part of that arrangement, the Postpetition Lender has also (on a prepetition basis) voluntarily paid off a corporate credit card of the Debtor in the amount of approximately $24,000 (which was important to the landlord because the landlord's principal, a former officer of the Debtor, had a personal guarantee on the card which had inadvertently not been released when he ceased to be an officer).  This transaction resulted in the decrease of debt owed by the Debtor, regardless of whether the Postpetition Lender ultimately is the successful bidder for the Debtor's assets.  In addition, the Postpetition Lender or its principals have also agreed to guarantee the Debtor's current lease to its current landlord for its main facility, which runs through December 31, 2019, which the landlord required as a condition precedent to offering a longer term lease to Postpetition Lender if it is the successful bidder for the Debtor's assets.

{8110552:7 }

18.     Finally, and importantly, this is not a so-called "roll-up," nor is it an instance where the same lending group is paying off its prepetition facility with monies advanced postpetition.  Rather, the Debtor is seeking the ability to use new money from the Postpetition Lender to fund operations during the chapter 11 case in order to provide the Debtor with satisfactory liquidity during the sale process.  The Debtor's ability to secure financing pursuant to the Postpetition Credit Agreement is critical to bridge the gap to fund administrative expenses in the case to get to a sale closing.

### Summary of Relief Requested

19.     By this Motion, the Debtor seeks the entry of an interim order (the "Interim Order") and final order (the "Final Order", and together with the Interim Order, collectively, the "Orders"), in a form substantially similar to the order attached hereto as Exhibit D (in regards to the Final Order, with conforming changes to provide for final relief and other final terms as outlined herein), among other things:

a.     authorizing the Debtor to obtain senior secured and superpriority postpetition financing, which will consist of a multi-draw term loan in the maximum principal amount of $400,000 (the "Postpetition Facility"), to be advanced in the amount of $200,000 upon the entry of the Interim Order, and the remaining $200,000 to be advanced upon the entry of the Final Order, each pursuant to the terms and conditions of the Postpetition Credit Agreement;

b.     approving the terms of the Postpetition Credit Agreement and the other related credit documents by and among the Debtor and the Postpetition Lender (collectively, the "Postpetition Loan Documents") and authorizing the Debtor to execute and deliver the Postpetition Credit Agreement and the Postpetition Loan Documents, to be bound by the Postpetition Loan Documents, and to perform such other acts as may be necessary or desirable in connection with the Postpetition Loan Documents;

c.     granting the Postpetition Facility and all obligations owing thereunder and under the Postpetition Loan Documents (collectively, the "Postpetition Obligations") allowed superpriority administrative expense claim status in the Debtor's bankruptcy case (the "Bankruptcy Case");

d.     granting to the Postpetition Lender automatically perfected security interests in and liens upon all of the Postpetition Collateral (as defined herein), which liens shall be subject to the priorities set forth herein;

       e.     authorizing the Debtor's use of cash collateral within the meaning of section 363(a) of the Bankruptcy Code in accordance with the Approved Budget and Postpetition Credit Agreement ("Cash Collateral");

       f.     approval of certain adequate protection to the Prepetition Secured Lender;

       g.     vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Postpetition Loan Documents, as limited hereby;

       h.     scheduling a final hearing (the "Final Hearing") to consider entry of the Final Order on the relief requested in this Motion and approving the form of notice with respect to the Final Hearing; and

       i.     waiving any applicable stay (including, without limitation, under Bankruptcy Rule 6004) and providing for immediate effectiveness of the Interim Order and the Final Order.

20.    In accordance with Bankruptcy Rule 4001, the principal terms of the relief requested in this Motion, subject to entry of a Final Order, are summarized as follows:[4]

| **Parties** | (a) <u>Borrower:</u>  American Home Products LLC, a Delaware limited liability company |
| --- | --- |
| | (b) <u>Lender:</u>   The Louver Shop Holdings, LLC,  a  Delaware limited liability company |
| **Postpetition Facility/Purpose** | (a) <u>Principal Amount:</u>  The Postpetition Lender has agreed to make a loan to the Debtor in the aggregate amount of $400,000, comprised of one single advance to the Debtor upon entry of the Interim Order in the amount of $200,000, and other advances to the Debtor upon entry of the Final Order in the aggregate amount of $200,000, each subject to the terms and conditions of the Postpetition Credit Agreement. <u>See</u> Postpetition Credit Agreement, § 2.01(a); Interim Order, ¶ 7. |
| | (b) <u>Maturity Date:</u> (a) August 16, 2019, or such date as agreed in writing by Borrower and Postpetition Lender, or (b) such earlier date upon which the Outstanding Amounts under the Postpetition Loan Facility are either due and payable or are otherwise paid in full in accordance therewith. <u>See</u> Postpetition Credit Agreement, § 1.01. |
| | (c) <u>Purpose:</u> Funding the Debtor's ongoing operations while the Debtor is operating as a debtor-in- possession in the Bankruptcy Case, in accordance with the Approved Budget, subject to the Permitted Variance. "Permitted Variance" means, with respect to |

---

[4]  This summary is qualified in its entirety by reference to the provisions of the Postpetition Loan Documents. To the extent of any discrepancy among this summary, and any of the Postpetition Loan Documents, the terms of the Postpetition Loan Documents shall govern and control. Capitalized terms not defined herein shall have the meanings ascribed to them in the Interim Order.

the Approved Budget, (i) all favorable variances, and (ii) an unfavorable variance of no more than ten (10%) in the aggregate. <u>See</u> Postpetition Credit Agreement, § 6.04; Interim Order, ¶ 8(b).

**Priority and Liens**

(a) <u>Collateral</u>:  All personal property of the Debtor, both tangible and intangible, including without limitation, accounts receivable, goods, inventory, farm products, equipment, general intangibles, contract rights, and all products and proceeds of the foregoing (the "Postpetition Collateral"); provided, however, that Collateral shall specifically <u>excludes</u> all claims and causes of action of the Debtor or their bankruptcy estate arising under the Bankruptcy Code (including, but not limited to Chapter 5 thereof). The Postpetition Collateral shall be subject to the Carve-Out (defined below). *See* Postpetition Credit Agreement, §§ 1.01 and 5.7; Interim Order, ¶ 9.

(b) <u>Liens and Superpriority Administrative Expense Status:</u> All of the Postpetition Liens and the super-priority status provided below shall be subject to the Carve-Out, and shall be provided as security for the full and timely payment of all of the obligations arising pursuant to the Postpetition Facility (the "<u>Postpetition Obligations</u>"), as follows:

(i) pursuant to section 364(c)(1) of the Bankruptcy Code, all of the Postpetition Obligations shall constitute allowed superpriority administrative claims, which shall have priority, subject only to the payment of the Carve-Out, over any and all administrative expense claims, unsecured claims, and all other claims against the Debtors or their estates, now existing or hereafter arising;

(ii) pursuant to section 364(c)(2) of the Bankruptcy Code, a perfected, binding, continuing, enforceable, and non-avoidable post-petition lien and security interest on all unencumbered Postpetition Collateral, subject only to the Carve-Out;

(iii) pursuant to section 364(c)(3) of the Bankruptcy Code, a perfected, binding, continuing, enforceable and non-avoidable postpetition lien and security interest on all Postpetition Collateral encumbered by the Prior Liens (other than the Primed Liens), of a priority immediately junior thereto, and subject to the Carve-Out; and

(iv) pursuant to section 364(d)(1) of the Bankruptcy Code, a perfected, binding, continuing, enforceable, and non avoidable postpetition, senior, priming lien and security interest on all Postpetition Collateral, senior to (x) the Prepetition Liens and (y) the Adequate Protection Liens (collectively, the "Primed Liens"), but pursuant to section 364(c)(3), immediately junior in priority to any and all

Prior Liens (other than the Primed Liens) on or in the Postpetition Collateral. The foregoing postpetition liens shall be subject to the Carve-Out.

See Postpetition Credit Agreement, § 1.01; Interim Order, ¶¶ 9-10.

| | | |
|---|---|---|
| **Proposed Bidding Procedures and Credit Bid** | (a) | <u>Proposed Bidding Procedures</u>: Contemporaneously herewith, the Debtor has filed its Motion for Entry of (I) an Order (A) Authorizing and Approving Bid Procedures in Connection with the Potential Sale of Substantially all the Debtor's Assets, et al. (the "Bid Procedures Motion"), under which the Debtor seeks to designate the Postpetition Lender as the stalking horse bidder. |
| | (b) | <u>Credit Bid</u>: In accordance with the Bid Procedures Motion, the Debtor has requested that the Prepetition Lender and/or the Postpetition Lender be permitted to offset all amounts then outstanding under the Prepetion Secured Facility and/or the Postpetition Facility against the cash portion of the purchase price bid for by the Prepetition Secured Lender and/or the Postpetition Lender for the Debtor's assets. |
| | | See Bid Procedures Motion. |
| **Carve-Out** | | <u>Carve-Out</u>: The Postpetition Liens and the Superpriority Claims, shall be subject to a Carve-Out (the "<u>Carve-Out</u>") for: |
| | | (a) fees owed to the Office of the United States Trustee, in such amounts as are determined by agreement with the Office of the United States Trustee or by final order of the Bankruptcy Court; (b) fees payable to the Clerk of the Bankruptcy Court; (c) the fees and expenses of Retained Professionals that are incurred or accrued on or prior to the Maturity Date, to the extent: (i) of the amounts set forth for the respective Retained Professional in the Budget(s); and (ii) that such amounts are later approved by the Bankruptcy Court pursuant to the Bankruptcy Code; and (d) the fees and expenses of all Retained Professionals that are incurred or accrued subsequent to the Maturity Date in a total amount not to exceed $30,000, to the extent that such amounts are later approved by the Bankruptcy Court pursuant to the Bankruptcy Code. |
| | | See Postpetition Credit Agreement, § 1.01; Interim Order, ¶ 13. |
| **Interest/Fees** | (a) | Interest: 9.00% |
| | (b) | Fees and Expenses: Debtor shall pay, upon the Maturity Date: (i) a $10,000 facility fee, and (ii) fees as shall have been separately agreed upon in writing in the amounts and approved by the Bankruptcy Court and at the times so specified. |

<u>See</u> Postpetition Credit Agreement, §§ 1.01, 2.05 and 2.06.

| | |
|---|---|
| **Events of Default** | Customary and appropriate terms in light of the size and purpose of the Postpetition Facility, which include, without limitation, the appointment of a trustee for the Debtor in this Bankruptcy Case, an order modifying the Postpetition Loan Documents without express consent of the Postpetition Lender, or the confirmation of a chapter 11 plan for the Debtor that proposes to alter the rights of the Postpetition Lender without its prior consent. |

<u>See</u> Postpetition Credit Agreement, § 8.01; Interim Order, ¶ 21.

**Borrowing Conditions**
(a)  The following are conditions precedent to Borrowing: Delivery by the Debtor to the Postpetition Lender of a fully and properly executed original of the Postpetition Credit Agreement, Postpetition Note, and Postpetition Security Agreement.
(b)  The entry of the Interim Order.
(c)  Ongoing compliance with the terms of the Postpetition Loan Documents and absence of an Event of Default thereunder.

<u>See</u> Postpetition Credit Agreement, §§ 4.01 and 4.02.

**Indemnification**    None.

**Waiver of Applicability of Non-Bankruptcy Law**    None, other than with respect to perfection (discussed below) and as a matter of law pursuant to the Bankruptcy Code.

**Relief From Automatic Stay**    The Postpetition Credit Agreement provides usual and customary terms; provided, however, that this Motion requests relief from the automatic stay for the Postpetition Lender to exercise remedies against the Postpetition Collateral upon an Event of Default and after three (3) business days' notice to the United States Trustee, counsel to the Debtor, and any committee appointed in this Bankruptcy Case of the Postpetition Lender's intent to exercise such remedies.

<u>See</u> Interim Order, ¶ 25(c).

**Applicability of Non-Bankruptcy Law Related to Perfection**    The Interim Order provides for the automatic perfection and validity of the liens, security interests and adequate protection provided in the Postpetition Credit Agreement, without the necessity of any further filing or recording under the laws of any jurisdiction.
<u>See</u> Interim Order at ¶ 20.

**<u>Provisions To Be Highlighted Pursuant To General Order No. 26-2019</u>**

21.     General Order No. 26-2019 (the "Court Procedures Order") promulgates certain procedures for use in complex chapter 11 cases that requires that financing motions must highlight the following provisions (the "Highlighted Provisions"), identify the location of any such provision in the proposed order, and justify such inclusion.

a.     <u>Cross-Collateralization.</u> Section G.1.a.i of the Court Procedures Order requires disclosure of provisions which grant cross-collateralization protection. There are no provisions which grant cross-collateralization protection (other than adequate protection and replacement liens).

b.     <u>Stipulation and Challenge Provisions.</u> Section G.1.a.ii of the Court Procedures Order requires disclosure of provisions which bind the estate or parties in interest with respect to the validity, perfection, or amount of the secured creditor's prepetition lien or the waiver of claims against the secured creditor without first giving parties in interest at least seventy-five (75) days from the entry of the order and the creditors' committee, if formed, at least sixty (60) days from the date of its formation to investigate such matters. Paragraph D of the Interim Order binds the estate and all parties in interest to the amount, validity, priority, perfection, and enforceability of the prepetition secured liens. However, as set forth in Paragraph 30 of the Interim Order, this provision is subject to a Challenge Period upon the earlier of (i) of 45 days from the Petition Date or (ii) 30 days after formation of the Committee. Therefore, all parties in interest will have a sufficient opportunity to investigate the prepetition secured liens.

c.     <u>506(c) Rights.</u> Section G.1.a.iii of the Court Procedures Order requires disclosure of any provisions which seek to waive the estate's rights under section 506(c) of the Bankruptcy Code.  Paragraph 18 of the Interim Order provides that, subject to and effective upon the entry of the Final Order, and subject to the Carve-Out, no costs or expenses of administration or other charge, lien, assessment or claim incurred on or after the Petition Date of any Person or entity shall be imposed against the Postpetition Lender or Prepetition Secured Lender, their respective claims or the Prepetition Collateral or Postpetition Collateral under section 506(c) of the Bankruptcy Code or otherwise, and the Debtor irrevocably waives any and all such rights, remedies and benefits under section 506(c) of the Bankruptcy Code.

d.     <u>Liens on Avoidance Actions.</u> Section G.1.a.iv of the Court Procedures Order requires the disclosure of provisions that grant prepetition secured creditors liens on avoidance actions pursuant to sections 544, 545, 547, 548, and 549 of the Bankruptcy Code. The Postpetition Lender will not

have been granted a lien in, among other things, the proceeds of any causes of action arising under sections 502(d), 544, 545, 547, 548, 549, and 550 of the Bankruptcy Code.

e. <u>Use of Postpetition Loans to Pay Prepetition Debt.</u> Section G.1.a.v of the Court Procedures Order requires disclosure of provisions which use postpetition loans from a prepetition secured creditor to pay all of that secured creditor's prepetition debt. The Postpetition Facility does not deem prepetition secured debt to be postpetition debt or use postpetition loans from a prepetition secured creditor to pay all or part of that secured creditor's prepetition debt.

f. <u>Carve-Out.</u> Section G.1.a.vi of the Court Procedures Order requires disclosure of provisions which provide disparate treatment for the professionals retained by a creditors' committee from those professionals retained by the debtor with respect to a professional fee carve-out. Paragraph 13 of the Interim Order provides for a Carve-Out of certain fees and expenses, including the Debtor's professionals and any professionals retained by any Creditors' Committee. The Interim Order does not provide for disparate treatment of such professionals, although each professional's Carve-Out rights will be limited to its own line item in the Approved Budget.

g. <u>Non-Consensual Priming Liens.</u> Section G.1.a.vii of the Court Procedures Order requires disclosure of provisions which prime any secured lien without the consent of that lienor. The Postpetition Facility does not provide for any non-consensual priming liens.

h. <u>Waiver of Bankruptcy Code section 552(b) "Equities of the Case".</u> Section G.1.a.viii of the Court Procedures Order requires disclosure of provisions which affect the Court's power to consider the equities of the case under Bankruptcy Code section 552(b)(1) of the Bankruptcy Code. The Interim Order does not contain such a waiver, nor will the Final Order.

22.     The provisions of the Postpetition Loan Documents are all justified under the circumstances of the Bankruptcy Case because the Postpetition Lender would not agree to the Postpetition Facility and the use of Cash Collateral without the inclusion of such terms. The funds provided by the Postpetition Facility are needed to allow the Debtor to operate and the Postpetition Facility presents the only available postpetition financing. The Debtor respectfully submits that the inclusion of the Highlighted Provisions is required and appropriate under the circumstances.

## **Request for Authority to Use Cash Collateral and to Incur Secured Postpetition Financing**

23.     The Debtor requires adequate liquidity for the operation of its business and administration of its bankruptcy estate, including, but not limited to, the payment of critical pre- and postpetition wages, salaries, and other expenses, which are essential to the preservation of the estate.  The continued operation of the Debtor is in the best interests of creditors, the estate, and all interested parties, because it will preserve going concern value, maintain employment, and provide a greater potential recovery for the Debtor's stakeholders than would the immediate termination and liquidation of the Debtor's business. Accordingly, as provided in the Interim Order and any Final Order, the Debtor has requested that: (a) the Prepetition Secured Lender make available to the Debtor all of Debtor's cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents, whether original collateral or proceeds, products, rents or profits of other Prepetition Collateral or the proceeds thereof (the "Cash Collateral") and (b) the Postpetition Lender provide post-petition financing pursuant to the terms and conditions of (i) the proposed Interim Order and any Final Order, (ii) the Postpetition Credit Agreement and all ancillary documents referred to in the Interim Order, the Postpetition Credit Agreement or any final order and/or required to be executed by the Debtor in connection with the Postpetition Credit Agreement, and (iii) the Approved Budget attached hereto as Exhibit E.

24.     As adequate protection for the Debtor's use of the Prepetition Lender's Cash Collateral, the Debtor requests that the Court provide, pursuant to sections 361(2), 362, 363(c)(2) and 363(e) of the Bankruptcy Code, valid, binding, enforceable and perfected liens and security interests in and on all the Postpetition Collateral (the "Adequate Protection Liens"), which will be subordinate only to (1) the Carve-Out, (2) the Postpetition Liens, and (3) the Prior Liens.

25.    The ability of the Debtor to continue its business and restructure under chapter 11 of the Bankruptcy Code depends upon the Debtor obtaining sufficient financing from the Postpetition Lender.  The Postpetition Lender is willing to make such loans and advances and provide such other financial accommodations on a secured basis, as more particularly described herein, solely in accordance with the proposed Interim Order, the Approved Budget, and pursuant to the terms and conditions of the Postpetition Credit Agreement.

## Basis For Relief

26.    The continued viability of the Debtor's business and the success of its restructuring efforts hinges upon the Debtor's ability to immediately access financing. Absent an immediate infusion of capital or access to financing, the Debtor simply cannot operate its business for the duration of the chapter 11 case to get to a sale closing. At this time, the Debtor's liquidity needs can be satisfied only if the Debtor is authorized to borrow under the proposed Postpetition Credit Agreement, and use such proceeds to fund operations and as otherwise provided in the Postpetition Credit Agreement and proposed Interim Order and Final Order.

27.    The Debtor is unable to obtain adequate unsecured credit allowable as an unsecured claim or superpriority administrative expense because nearly all of the Debtor's assets remain subject to prepetition liens. The Postpetition Credit Agreement described herein reflects the most favorable terms on which a lender was willing to offer financing. The proceeds from the Postpetition Credit Agreement will allow the Debtor to continue its operations in the ordinary course, maintain prudent cash balances, fund restructuring costs, and otherwise meet its liquidity needs during the chapter 11 case. Finally, the terms of the Postpetition Loan Documents are fair and reasonable and reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties.

A.     <u>The Terms of the Postpetition Loan Documents Are Fair, Reasonable and Appropriate</u>

28.     The terms and conditions of the Postpetition Loan Documents are fair, reasonable and appropriate in the circumstances presented, and were negotiated by the parties in good faith and at arm's length.

29.     The Postpetition Lender has required that the Debtor grant the liens and superpriority claims contemplated by the Interim Order and the Postpetition Loan Documents upon the terms and conditions set forth therein. Those liens and superpriority claims will be subject to the Carve-Out (as defined in the Postpetition Credit Agreement), which includes professional fees that are accrued and unpaid through the time of any event of default, up to $30,000 in professional fees accruing after notice of an event of default, and amounts payable to the United States Trustee. Such carve outs generally "preserve the adversary system" by ensuring that committees and a debtor's estate are adequately assisted by counsel. See <u>In re Ames Dep't Stores, Inc.</u>, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (noting that courts generally "insist on a carve-out" for professional fees, and that "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced").   Additionally, the Carve-Out protects against administrative insolvency during the course of the chapter 11 case by ensuring that assets remain for the payment of United States Trustee fees and professional fees of the Debtor and any official committee appointed in this case, notwithstanding the grant of superpriority and administrative liens and claims under the Postpetition Credit Agreement. The Postpetition Credit Agreement provides the Debtor with the liquidity it needs to operate its business during the chapter 11 case, which will preserve the value of its assets while the Debtor restructures. The Debtor and its advisors have concluded that the terms of the Postpetition Credit Agreement are reasonable and appropriate under the circumstances.

30.     Bankruptcy courts routinely defer to a debtor's business judgment in considering whether to approve the debtor's request to obtain postpetition financing. See e.g., Trans World Airlines, Inc. v. Travelers Int'l AG (In re Trans World Airlines, Inc.), 163 B.R. 964, 974 (Bankr. D. Del. 1994) (quoting order approving post-petition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); In re Ames Dep't Stores, Inc., 115 B.R. at 40 (The court should defer to debtor's "reasonable business judgment . . . so long as the financing agreement does not . . . leverage the bankruptcy process" and its purpose is to benefit the estate rather than another party-in-interest.).

31.     The Debtor has exercised its reasonable business judgment in determining that the Postpetition Credit Agreement is the best financing option available under the present circumstances, and the Debtor has satisfied the legal requirements to incur the Postpetition Obligations (as defined in the Interim Order) on the terms and conditions set forth in the Postpetition Loan Documents. The Debtor believes that the Postpetition Loan Documents contain terms that are fair, reasonable, and in the best interests of the Debtor and its estate. Accordingly, the Debtor respectfully submits that it should be authorized to enter into the Postpetition Loan Documents and obtain access to the Postpetition Credit Agreement on the terms described herein.

**B.      The Debtor Should Be Authorized to Obtain Postpetition Financing on a Senior Secured and Superpriority Basis**

32.     Section 364 of the Bankruptcy Code allows a debtor to obtain (a) unsecured credit in the ordinary course of business, (b) unsecured credit outside the ordinary course of business, (c) credit with specialized priority or with certain security interests, and (d) secured credit by granting a senior or *pari passu* lien on already encumbered property. In other words, section 364 is "structured with an escalating series of inducements . . ." that may be offered to attract

postpetition financing. <u>Sapir v. CPQ Colorchrome Corp. (In re Photo Promotion Assocs., Inc.)</u>, 87 B.R. 835, 839 (Bankr. S.D.N.Y. 1988), aff'd, 881 F.2d 6 (2d Cir. 1989). Accordingly, if a debtor cannot obtain postpetition financing on an unsecured basis under sections 364(a) and (b), the bankruptcy court may authorize a debtor to obtain postpetition financing on a superpriority administrative expense basis pursuant to section 364(c), secured by a senior lien on unencumbered property or secured by a junior lien on encumbered property.

33.    Courts consider various factors in determining whether a debtor may obtain postpetition financing under section 364(c) of the Bankruptcy Code, including whether (i) the debtor is unable to obtain secured credit under section 364(b), (ii) the credit transaction is necessary to preserve the assets of the estate, (iii) the terms of the transaction are fair, reasonable and adequate given the circumstances of the debtor-borrower and the proposed lender, (iv) entry into the financing constitutes an exercise of the debtor's sound and reasonable business judgment, and (v) the financing was negotiated in good faith and at arm's length between the debtor and the lender.   <u>In re Farmland Indus., Inc.</u>, 294 B.R. 855, 879-81 (Bankr. W.D. Mo. 2003); <u>see also</u> <u>In re Aqua Assocs.</u>, 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991) (applying factors 1-3).

34.    To satisfy the requirements of section 364(c) of the Bankruptcy Code, a debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured or administrative expense basis. <u>Bray v. Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co.)</u>, 789 F.2d 1085, 1088 (4th Cir. 1986). "The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." <u>Id</u>. When few lenders are likely to be able and willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for

financing." In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom.,
Anchor Savs. Bank FSB v. Sky Valley, Inc., 99 B.R. 117, 120 n. 4 (N.D. Ga. 1989); see also In
re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (approving financing
facility and holding that the debtor made reasonable efforts to satisfy the standards of section
364(c) where it approached four lending institutions, was rejected by two, and selected the most
favorable of the two offers it received).

35.    Due to the existing prepetition liens and security interests on the Debtor's assets,
the Debtor is unable to procure sufficient debtor in possession financing in the form of either
unsecured credit under sections 364(a) or (b) of the Bankruptcy Code, solely in exchange for the
grant of an administrative expense or superpriority administrative expense claim or on a junior
lien basis under section 364(c) of the Bankruptcy Code. Neither the Postpetition Lender nor any
other potential lenders were willing to commit to postpetition financing on these terms.  Indeed,
almost any proposal other than the one submitted by the Postpetition Lender would have likely
involved added costs and risks associated with nonconsensual priming litigation.  As Judge Peck
of the Southern District of New York has correctly pointed out, "[t]hat which helps to foster
consensus may be preferable to a notionally better transaction that carries the risk of promoting
unwanted conflict." In re Ion Media Networks, Inc., Case No. 09-13125, 2009 WL 2902568
(Bankr. S.D.N.Y. July 6, 2009).  As noted in the Tanner Declaration, the Debtor conducted a
prepetition process in search of financing and/or a transaction.  The loan provided by the
Postpetition Lender has the best terms of any of the parties that expressed an interest in the
providing financing or acquiring the Debtor's assets.  However, the Postpetition Lender was only
willing to do such a deal if it received the protections of section 364 of the Bankruptcy Code.

36.     Based on the foregoing, the Debtor believes that it would not have been able to obtain debtor in possession financing on more favorable terms from other sources. See, e.g., Bray v. Shenandoah Fed. Savs. & Loan Ass'n, 789 F.2d at 1088 (section 364 "imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable.").

C.     **The Debtor Should Be Authorized to Obtain Postpetition Financing Secured by Priming Liens**

37.     If the incentives available under section 364(c) of the Bankruptcy Code are insufficient to attract post-petition financing, a bankruptcy court may authorize post-petition credit under section 364(d) secured by a senior or *pari passu* lien on encumbered property (i.e., a "priming" lien) without consent from the affected lienholders if (i) the debtor cannot otherwise obtain credit and (ii) the interests of the existing lienholders are adequately protected. See 11 U.S.C. § 364(d)(1); In re Aqua Assocs., 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991) (listing the above factors and also requiring that the "credit transaction" be "necessary to preserve assets of the estate").

38.     The Debtor approached the Original Lenders, other financial parties, and certain of its equity holders to serve as potential financing sources, and ultimately determined that the Postpetition Lender offered the best available option for obtaining postpetition financing.  In fact, the Debtor could not obtain postpetition financing of the type and size needed without the consent of the Prepetition Secured Lender.  In this instance, the Postpetition Lender and the Prepetition Secured Lender and the same entity and the Prepetition Secured Lender consents to priming liens under the Postpetition Credit Agreement.

**D.**    **The Debtor Should Be Authorized to Use Cash Collateral**

39.    The Debtor requires use of Cash Collateral in order to allow the orderly continuation of its business, to maintain business relationships with vendors, to make payroll, to fund expenditures and to satisfy other operational needs, among other things.

40.    Section 363(c)(2) of the Bankruptcy Code provides that the Debtor may not use, sell, or lease cash collateral unless "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." See 11 U.S.C. § 363(c)(2). Here, the Postpetition Lender has consented to the Debtor's use of Cash Collateral on the terms and conditions set forth in the Interim Order and in the Postpetition Credit Agreement.

41.    Accordingly, based upon the foregoing, the Debtor respectfully requests that the Court authorize the Debtor to use the Cash Collateral in accordance with the terms set forth in the Interim Order.

**E.**    **The Debtor Should Be Authorized to Provide Adequate Protection to the Prepetition Secured Lender**

42.    A debtor may obtain postpetition credit that is "secured by a senior or equal lien on property of the estate that is subject to a lien only if" the debtor, among other things, provides "adequate protection" to those parties whose liens are primed. See 11 U.S.C. § 364(d)(1)(B). Adequate protection is evaluated on a case-by-case basis and may be provided in various forms, including payment of adequate protection fees, payment of interest, or granting of replacement liens or administrative claims. See In re Mosello, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("[T]he determination of adequate protection is a fact specific inquiry . . . left to the vagaries of each case . . . .") (citation and quotation omitted).

43.    A debtor may only obtain postpetition financing "secured by a senior or equal lien on property of the estate that is subject to a lien only if" adequate protection is provided to parties whose liens are primed. 11 U.SC. § 364(d)(1)(B). Bankruptcy Code section 361 delineates the forms of adequate protection, which include periodic cash payments, additional liens, replacement liens and other forms of relief. Adequate protection is determined on a case-by-case basis and may take various forms. See, e.g., In re Continental Airlines, Inc., 154 B.R. 176, 180-81 (Bankr. D. Del. 1993); MBank Dallas., N.A. v. O'Connor (In re O'Connor), 808 F.2d 1393, 1396-97 (10th Cir. 1987); Martin v. U.S. (In re Martin), 761 F.2d 472, 474 (8th Cir. 1985); In re Shaw Indus., Inc., 300 B.R. 861, 865 (Bankr. W.D. Pa. 2003). The focus of this requirement is to protect a secured creditor from diminution in the value of its interest in the particular collateral during the period of use. See In re Swedeland Dev. Grp., Inc., 16 F.3d 552, 564 (3d Cir. 1994) ("The whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy.").

44.    The concept of adequate protection is designed to shield a secured creditor from diminution in the value of its interest in collateral during the period of a debtor's use. See In re Carbone Cos., 395 B.R. 631, 635 (Bankr. N.D. Ohio 2008) ("The test is whether the secured party's interest is protected from diminution or decrease as a result of the proposed use of cash collateral); see also In re Cont'l Airlines, Inc., 154 B.R. 176, 180-81 (Bankr. D. Del. 1993) (holding that adequate protection for use of collateral under section 363 is limited to use-based decline in value).

45.    Here, the adequate protection offered to the Prepetition Secured Lender and the Postpetition Lender is fair and reasonable. The adequate protection proposed in the Interim Order is consistent with customary protections, including replacement liens, reporting and superpriority

claims. The adequate protection properly protects the Prepetition Secured Lender and the Postpetition Lender from any diminution in value of their interests in the use of the cash collateral during the pendency of the Bankruptcy Case. These provisions were negotiated in good faith and at arm's length with the Postpetition Lender. Without these protections, the Debtor would not be able to secure the Postpetition Credit Agreement.

**F.** **Support for Modification of Automatic Stay**

46. As set forth more fully in the proposed Interim Order, the Postpetition Credit Agreement contemplates a modification of the automatic stay established pursuant to section 362 of the Bankruptcy Code to permit the Postpetition Lender to take certain actions permitted or required under the Postpetition Loan Documents and to enforce certain remedies against the Postpetition Collateral without having to obtain any further order of this Court on the third business day after notice of an event of default.

47. The Debtor submits that stay modification provisions such as these are ordinary and usual features of postpetition financing facilities and, in the Debtor's business judgment, are reasonable under the present circumstances. Accordingly, the Debtor respectfully requests that the Court authorize the modification of the automatic stay in accordance with the terms set forth in the Interim Order and the Postpetition Loan Documents.

**G.** **The Postpetition Lender Is Entitled to the Protections Under Section 364(e) of the Bankruptcy Code**

48. Section 364(e) of the Bankruptcy Code, which protects a good faith lender's right to collect on loans extended to a debtor and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal, was designed to "encourage lenders to extend credit to debtors by eliminating the risk that any lien securing the loan will be modified on appeal." Keltic Fin. Partners, LP v. Foreside

Mgmt. Co. (In re Foreside Mgmt. Co.), 402 B.R. 446, 451 (B.A.P. 1st Cir. 2009) (citing Shapiro v. Saybrook Mfg. Co. (In re Saybrook Mfg. Co.), 963 F.2d 1490, 1493 (11th Cir. 1992)); see also White Rose Food v. General Trading (In re Clinton St. Food Corp.), 170 B.R. 216, 220 (S.D.N.Y. 1994) (noting that section 364(e)'s purpose "is to overcome[s] parties' reluctance to lend to a bankrupt firm . . ."); Fleet Nat'l Bank v. Doorcrafters (In re N. Atl. Millwork Corp.), 155 B.R. 271, 279 (Bankr. D. Mass. 1993) ("The purpose of Section 364(e) is to allow good faith lenders to rely upon conditions at the time they extend credit and to encourage lenders to lend to bankruptcy entities.").

49.    The Debtor believes that the terms and conditions of the Postpetition Credit Agreement are fair and reasonable and are the best possible terms on which the Debtor could obtain postpetition financing. Further, the terms and conditions of the Postpetition Loan Documents were negotiated in good faith and at arm's length with all parties represented by experienced counsel. Accordingly, the Postpetition Lender should be provided with the benefit and protection of section 364(e) of the Bankruptcy Code, such that if any of the provisions of the Postpetition Credit Agreement are later modified, vacated, stayed or terminated by subsequent order of this or any other Court, the Postpetition Lender will be fully protected with respect to any amounts previously disbursed.

**H.    The Payment of Fees to the Postpetition Lender Is Appropriate**

50.    As described above, the Debtor has agreed, subject to Court approval, to a $10,000 origination fee for the Postpetition Facility, plus such fees as shall have been separately agreed upon in writing in the amounts and approved by the Bankruptcy Court and at the times so specified.

51.    The fees and other obligations under the Postpetition Loan Documents were negotiated in good faith and at arm's length and represent the most favorable terms to the Debtor

on which the Postpetition Lender would agree to make the Postpetition Credit Agreement available. The Debtor considered the fees described above when determining in its sound business judgment that the Postpetition Loan Documents constitute the best terms on which the Debtor could obtain the postpetition financing necessary to continue its operations. The Debtor determined that paying these fees in order to obtain the Postpetition Credit Agreement is in the best interests of the Debtor's estate, creditors, and other parties in interest.

52.     Further, the fees are reasonable and appropriate under the circumstances. Courts routinely authorize similar lender incentives beyond the explicit liens and rights specified in section 364 of the Bankruptcy Code. See In re Defender Drug Stores, Inc., 145 B.R. 312, 316 (9th Cir. BAP 1992) (approving extension of financing facility pursuant to section 364 of the Bankruptcy Code that included a lender "enhancement fee").

**I.    <u>The Postpetition Liens Should Be Deemed Effective</u>**

53.     In order to effectuate the Postpetition Loan Documents, the Postpetition Liens (as defined in the Interim Order) should be (a) deemed effective and perfected in all respects as of the Petition Date and without the necessity of the Debtor or the Postpetition Lender preparing, executing, entering into, recording or filing any financing statements, mortgages, notices of lien, control agreements, pledge agreements, or similar instruments in any jurisdiction, and without the necessity of the Postpetition Lender taking possession or control of any collateral or Postpetition Lender taking any other action to attach or prefect the Postpetition Liens conceived of in the Postpetition Loan Documents, and (b) shall extend and attach to all collateral and any proceeds of collateral which is presently in existence or hereafter is acquired or arises (whether acquired or arising before, on or after the Petition Date) and in which the Debtor has any legal or equitable interest, whether held by the Debtor or by any other person for the Debtor's account, and wherever located.   Notwithstanding the foregoing, the Postpetition Lender should be

allowed, in its sole discretion, to file such financing statements, mortgages, notices of liens and other similar documents without seeking modification of the automatic stay under section 362 of the Bankruptcy Code and all such financing statements, mortgages, notices of liens and other similar documents shall be deemed to have been filed or recorded at the time and on the date of the commencement of this Bankruptcy Case.

**J.**    **Immediate Relief Interim Is Necessary to Avoid Immediate and Irreparable Harm**

54.    Federal Rule of Bankruptcy Procedure (the "Bankruptcy Rules") 4001(c) provides that:

> The court may commence a final hearing on a motion for authority to obtain credit no earlier than 14 days after service of the motion. If the motion so requests, the court may conduct a hearing before such 14-day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

Bankruptcy Rule 4001(c)(2). Similarly, Bankruptcy Rule 6003 provides that the relief requested in this Motion may be granted if the "relief is necessary to avoid immediate and irreparable harm . . .". Fed. R. Bankr. P. 6003; see also In re First NLC Fin. Servs., LLC, 382 B.R. 547, 549 (Bankr. S.D. Fla. 2008) (holding that Rule 6003 permits entry of retention orders on an interim basis to avoid irreparable harm). The Third Circuit has interpreted the language "immediate and irreparable harm" in the context of preliminary injunctions. In that context, the court has instructed that irreparable harm is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation. See, e.g., Norfolk S. Ry. Co. v. City of Pittsburgh, 235 F. App'x 907, 910 (3d Cir. 2007) (citing Glasco v. Hills, 558 F.2d 179, 181 (3d Cir. 1977)). Furthermore, the harm must be shown to be actual and imminent, not speculative or unsubstantiated. See, e.g., Acierno v. New Castle County, 40 F.3d 645, 653-55 (3d Cir. 1994). The Debtor submits that for the reasons already set

{8110552:7 }

forth herein, the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtor.

55.      Generally, courts find "immediate and irreparable harm" exists where loss of the business threatens ability to reorganize. See In re Ames Dep't Stores, Inc., 115 B.R. at 36 n.2. Approval of the Postpetition Credit Agreement on an interim basis under Rule 4001(c)(2) is left to the discretion of the court as informed by the facts of each case. In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions, and a debtor should be entitled to borrow those amounts that it believes prudent in the operation of its business. See In re Trans World Airlines, Inc., 163 B.R. at 974; In re Ames Dep't Stores, Inc., 115 B.R. at 40. After the 14-day period, the request for financing is not limited to those amounts necessary to prevent the destruction of the debtor's business, and the debtor is entitled to borrow those amounts that it believes are prudent to the operation of its business. In re Ames Dep't Stores, Inc., 115 B.R. at 36.

56.      The Debtor seeks expedited approval of the relief requested in this Motion in light of the immediate and irreparable harm that the Debtor's estate will incur unless it obtains the financing necessary to sustain its business. Absent sufficient funds to support the Debtor's operating business the Debtor's business and assets will quickly erode to the detriment of the Debtor's estate, creditors and employees.  For the reasons set forth above, the Debtor submits that immediate access to $30,000 of initial funding in accordance with the Approved Budget under the Postpetition Credit Agreement is necessary to preserve the value of the Debtor's estate for the benefit of its creditors and other parties in interest.

**K.**      **Request for Final Hearing**

57.      Pursuant to Bankruptcy Rule 4001(b) and (c), a final hearing on this Motion to use cash collateral and obtain financing may not be commenced earlier than 14 days after the

service of such motion.  Upon request, however, a bankruptcy court is empowered to conduct a preliminary expedited hearing on such motion and authorize use of cash collateral to avoid immediate and irreparable harm to a debtor's estate.  See Bankruptcy Rule 4001(b)(2) and (c)(2).

58.    The Debtor requests that the Court: (a) conduct an expedited hearing with respect to this Motion; and (b) schedule the Final Hearing at the earliest possible date in accordance with Bankruptcy Rule 4001(b) and (c).

**L.**    **Waiver of Any Applicable Stay**

59.    The Debtor also requests that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  As described above, the relief that the Debtor seeks in the Motion is necessary for the Debtor to operate without interruption and to preserve value for its estate. Accordingly, the Debtor respectfully requests that the Court waive the 14 day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate waive.

## Notice

60.    No trustee, examiner or official committee has been appointed in this chapter 11 case. Notice of this Motion has been served on the following parties or, in lieu thereof, to their counsel, if known: (i) the United States Trustee for the Northern District of Georgia; (ii) those creditors listed on each of the Debtor's List of Creditors Holding 20 Largest Unsecured Claims; (iii) the Debtor's prepetition secured lender; (iv) the Debtor's proposed debtor-in-possession lender; (iv) the Internal Revenue Service; (v) the Georgia Department of Revenue; (vi) the Attorney General for the State of Georgia; (vii) the United States Attorney for the Northern District of Georgia; (viii) all persons or entities known or reasonably believed to have asserted an

{8110552:7 }

interest in the Cash Collateral; and (ix) those parties who have requested service of notice in this case.  In light of the nature of the relief requested herein, the Debtor submits that no other or further notice need be given.

## **No Prior Request**

61.    No prior request for the relief sought in this Motion has been made to this or any other court.

WHEREFORE, the Debtor respectfully requests entry of the Orders granting the relief requested herein.

{8110552:7 }

May 29, 2019                         Respectfully submitted,

                                    /s/ Charles N. Kelley, Jr.
                                    Sean D. Malloy[5]
                                    Ohio State Bar No. 0073157
                                    Michael J. Kaczka
                                    Ohio State Bar No. 0076548
                                    Maria G. Carr
                                    Ohio State Bar No. 0092412
                                    McDONALD HOPKINS LLC
                                    600 Superior Avenue, E., Suite 2100
                                    Cleveland, OH 44114
                                    Telephone: (216) 348-5400
                                    Facsimile: (216) 348-5474
                                    E-mail: smalloy@mcdonaldhopkins.com
                                            mkaczka@mcdonaldhopkins.com
                                            mcarr@mcdonaldhopkins.com

                                    -and-

                                    Charles N. Kelley, Jr.
                                    Georgia State Bar No. 412212
                                    KELLEY & CLEMENTS LLP
                                    PO Box 2758
                                    Gainesville, GA 30503
                                    Telephone: 678-567-6120
                                    Email: ckelley@kelleyclements.com

                                    PROPOSED COUNSEL FOR DEBTOR
                                    AND DEBTOR IN POSSESSION

---

[5] The McDonald Hopkins LLC attorneys will file motions for *pro hac vice* admission in this action on May 30, 2019.